AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Information associated with | )    Case No.    MJ21-050 |
| Apple ID thejunebug206@icloud.com | ) |
| that is stored at premises controlled by Apple | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distribution/Possession w/Intent to Distribute Controlled Substances |
| 18 U.S.C. 924(c) | Carrying a Firearm During and in Relation to a Drug Trafficking Crime |

The application is based on these facts:

✓ See Affidavit of SA J. Benjamin Hunt, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

J. Benjamin Hunt, Special Agent

*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 1/26/2021

*Judge's signature*

City and state: Seattle, Washington

Hon. Paula L. McCandlis, United States Magistrate Judge

*Printed name and title*

USAO: 2020R00604

1    **AFFIDAVIT OF J. BENJAMIN HUNT**

2    STATE OF WASHINGTON         )

3                               )    ss
     COUNTY OF KING              )

4

5         I, J. Benjamin Hunt, being first duly sworn on oath, depose and say:

6                 **I.    INTRODUCTION AND AGENT BACKGROUND**

7         1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

8    Explosives (ATF), currently assigned to the Seattle I Field Office.  As such, I am a law

9    enforcement officer of the United States with the power to serve subpoenas and warrants

10   issued under the authority of the United States and to make arrests for offenses against the

11   laws of the United States, as codified in Title 18 of the United States Code, Section 3051.  I

12   have been a Special Agent with the ATF since August 2004.  Prior to my work for the

13   ATF, I attended law school, served as an intern in the United States Department of Justice

14   and later worked as an attorney in the District of Columbia.

15        2.    Upon my employment with the ATF, I completed the Federal Law

16   Enforcement Training Center's Criminal Investigator Training Program and the ATF

17   National Academy's Special Agent Basic Training in Glynco, Georgia, in 2005.  Originally

18   assigned to the ATF New York Field Division, I worked in the Joint Firearm Task Force in

19   New York Group V and later New York Group I, a gang investigation group.  Both groups

20   were located in Brooklyn.  In 2010, I transferred to Seattle, Washington, where I have

21   worked in ATF Seattle V, Violent Gang Task Force, and now in Seattle Group I, Puget

22   Sound Regional Crime Gun Task Force South.  I have subsequently completed training

23   with the NYPD regarding Homicide Investigations, ATF's Complex Investigations and

24   Advanced Complex Investigations schools.  I am a member of the ATF's Enhanced

25   Undercover Program and have worked extended details in Southern California, Central

26   California, Portland, Oregon, and Baltimore, Maryland.

27        3.    During my professional experience I have conducted and participated in

28   numerous investigations regarding the illegal possession of firearms, firearm trafficking,

1  violent crime and narcotics. I have participated in undercover operations, Title III wiretrap
2  investigations and the execution of search warrants associated with investigative targets
3  and the execution of the arrest warrants on those investigative targets. I have conversed at
4  length with investigative targets in an undercover capacity and overtly as a law
5  enforcement officer in formal interviews. I have conducted undercover purchases of
6  firearms and ammunition, grenades, cocaine, crack cocaine, heroin, methamphetamine,
7  fentanyl and other opioid pills. In an undercover capacity, I have been involved in money
8  laundering investigations and I have investigated bulk cash smuggling as well. The vast
9  majority of my investigative experience has involved organized entities from Criminal
10 Street Gangs to International Drug Trafficking Organizations and Terror Groups. As such,
11 I am familiar with the modus operandi of those conducting violent crime and narcotics
12 related crimes with firearms and firearm trafficking. I am also familiar with the manner in
13 which drug traffickers use telephones, often cellular telephones, to conduct their unlawful
14 operations, and how they code their conversations to disguise their unlawful activities.

15                    **II.    PURPOSE OF THIS AFFIDAVIT**

16     4.     I make this affidavit in support of an application for a search warrant under
17 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter
18 "Apple") to disclose to the government records and other information, including the
19 contents of communications, associated with the Apple ID: **thejunebug206@icloud.com**,
20 which is stored at premises owned, maintained, controlled, or operated by Apple, a
21 company headquartered at One Apple Park Way, Cupertino, California, 95014. The
22 information to be disclosed by Apple and searched by the government is described in the
23 following paragraphs and in Attachments A and B.

24     5.     The facts in this affidavit come from my personal observations, my training
25 and experience, and information obtained from other agents and witnesses. This affidavit is
26 intended to show merely that there is sufficient probable cause for the requested warrant
27 and does not set forth all of my knowledge about this matter.

28

AFFIDAVIT OF SA HUNT - 2
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

6. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of 21 U.S.C. §§ 841(a)(1), 846 (Distribution/Possession with Intent to Distribute Controlled Substances and Conspiracy to Distribute Controlled Substances), 18 U.S.C. 922(n) (Unlawful Receipt of a Firearm), 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of Drug Trafficking and Carrying a Firearm During and in Relation to a Drug Trafficking Crime), 18 U.S.C. § 1512 (Witness Intimidation), 18 U.S.C. § 1513 (Witness Retaliation), 18 U.S.C. §§ 844(h)(i) and (m) (Arson and Conspiracy to Commit Arson), and 18 U.S.C. § 401 (Contempt of Court), as described in Attachment B.

### III. JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### IV. THE INVESTIGATION

8. From May 26, 2020 to August 11, 2020, agents and investigators of ATF, HSI, DEA and the King County Sheriff's Office conducted an investigation into David ROSARIO, a.k.a. JUNE, a.k.a. JUNEBUG, for firearms and narcotics violations. The investigation began when a confidential informant (CI-1) told investigators that ROSARIO sold pound-quantities of heroin and methamphetamine and also sold firearms.[1] CI-1 introduced me to ROSARIO while I was acting in an undercover capacity.

9. During the investigation, ROSARIO sold me four firearms on four different dates: May 29, 2020, June 15, 2020, June 27, 2020, and July 21, 2020. On May 29, 2020, ROSARIO also sold me approximately 53 grams of heroin and approximately 15.1 grams

---

[1] CI-1 has juvenile felony convictions for crimes of dishonesty, specifically, attempted burglary and theft of a motor vehicle. CI-1 assisted law enforcement in exchange for law enforcement's agreement not to refer criminal charges arising out of an incident where he/she was stopped by police and found to be in possession of narcotics.

1   of methamphetamine, while armed with a pistol.  On another occasion, June 8, 2020,

2   ROSARIO sold me approximately 28.4 grams of methamphetamine and no firearms.

3       10.    Additionally, on May 29, 2020, ROSARIO sold 100 M/30 pills (suspected

4   fentanyl) to CI-1.  On June 8, 2020 ROSARIO sold 50 M/30 pills (suspected fentanyl) to

5   CI-1.[2]

6       11.    During this investigation, while I was acting in an undercover capacity,

7   ROSARIO texted me photographs of firearms that he possessed and photographs of

8   firearms that he offered to sell me on June 27th, July 20th and August 10th .  ROSARIO

9   also discussed distributing controlled substances other customers.  Further, while

10   conducting surveillance of ROSARIO and his associates between May 26, 2020 and

11   August 11, 2020, agents frequently observed ROSARIO performing activity that, based on

12   their training and experience, looked like the distribution of controlled substances to

13   numerous customers throughout King County.  This activity frequently involved

14   ROSARIO driving to different locations, as well as frequent short trips and hand-to-hand

15   transactions conducted in and around vehicles.

16       12.    On August 10, 2020, the Honorable Mary Alice Theiler, United States

17   Magistrate Judge, issued an arrest warrant for ROSARIO and search warrants for

18   ROSARIO's vehicles and a residence in Federal Way.  *See* MJ20-512 (Complaint); MJ20-

19   513 (Vehicle Search Warrant); MJ20-514 (Residence Search Warrant).  These warrants

20   were executed on August 11, 2020, at a motel in SeaTac, Washington.  When agents

21   searched one of ROSARIO's vehicles, they recovered a firearm that ROSARIO had

22   offered to sell me.

23       13.    After ROSARIO was arrested, agents obtained a search warrant for another

24   vehicle and two hotel rooms connected to ROSARIO and his associates.  *See* MJ20-518.

25   These search warrants resulted in the seizure of additional firearms.

26

27   [2] The heroin and methamphetamine field-tested positive and have been sent to a Drug Enforcement Administration

28   laboratory for further analysis.  The fentanyl could not be field-tested and has been sent to a Drug Enforcement
Administration laboratory for analysis.

14.     ROSARIO had an initial appearance before the United States District Court for the Western District of Washington on August 11, 2020, and received a copy of the Complaint. My identity as an undercover officer and CI-1's identity as the person who introduced me to ROSARIO would have been immediately apparent to ROSARIO from the details of the drug and firearms transactions described in the Complaint.

15.     On August 18, 2020, ROSARIO was released on an appearance bond to the third-party custody of his father, David Rosario Sr. who resides at 3025 Northeast 7th Street in Renton, Washington. In relevant part, the appearance bond required that ROSARIO:

- Provide Pretrial Services with his current address and phone number, and not change residence without the approval of Pretrial Services;

- Not commit a federal, state, or local crime during the period of his release;

- Not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers or other persons related to official proceedings before the court in violation of Title 18 U.S.C. §§ 1503, 1512 and 1513; and

- Not possess firearms.

16.     On August 20, 2020, a grand jury in the Western District of Washington returned an indictment charging ROSARIO with two counts of distributing controlled substances, in violation of 21 U.S.C. § 841(a)(1), and one count of carrying firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). ROSARIO was arraigned on the indictment on September 3, 2020. Trial is scheduled for April 12, 2021. *See* CR20-133 RAJ.

### Threats Against CI-1

17.     Shortly after ROSARIO's release, I learned from CI-1 that ROSARIO was not in the custody of David Rosario Sr., but that he was living with friends who had been involved with ROSARIO during several of the undercover sales of firearms and narcotics during the aforementioned investigation. CI-1 told me that he/she had been warned that

AFFIDAVIT OF SA HUNT - 5
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  ROSARIO would try to hurt or kill him/her.  CI-1 has been reluctant to provide details

2  about the people providing him/her with information about ROSARIO for fear of further

3  retaliation.

4       18.     In November 2020, I obtained surveillance video footage of an event on

5  November 1, 2020, at approximately 1:53 AM, where an individual driving a gold pickup

6  truck repeatedly rammed into a vehicle belonging to CI-1, causing significant front-end

7  damage, before driving away from CI-1's apartment complex.

8       19.     On November 20, 2020, between 3:00 AM and 4:00 AM, a resident of CI-1's

9  apartment complex, reported a fire in the carport of the apartment complex.  King County

10  fire fighters responded and extinguished the fire, which had severely burned a 1993

11  Pontiac Z28, convertible belonging to CI-1 and damaged several vehicles parked to the

12  sides of CI-1's vehicle.  I learned from the Supervisor of the King County Sheriff's

13  Office's Arson Unit that the fire endangered the entire building and likely would have

14  resulted in death if King County Fire Rescue had arrived any later.

15       20.     On December 12, 2020, at approximately 8:20 PM, I received notification

16  from CI-1 that an individual whom he/she could not identify had pressed his ear to CI-1's

17  door and attempted to make entry into the residence.  I received and reviewed security

18  camera footage of the event.  The camera is motion activated and thus, due to lag time,

19  does not capture the entire duration of the incident, but shows a hooded male at CI-1's

20  door, attempting to listen to individuals inside and then leaving.  Footage of a camera

21  outside of the CI's apartment complex reveals that a black sedan, not consistent with any

22  vehicle belonging to a resident of the complex, pulled into the apartment complex minutes

23  before the event.

24       21.     CI-1 has insisted that, aside from ROSARIO, he/she is not aware of anyone

25  else who has threatened him/her or would be motivated to harm him/her.

26                          **Agent Surveillance of ROSARIO**

27       22.     On December 11, 2020, while investigating the vehicle fire, I observed David

28  ROSARIO outside an apartment building at 6512 35th Avenue Southwest, in Seattle,

AFFIDAVIT OF SA HUNT - 6
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Washington, where several law enforcement databases have listed ROSARIO's girlfriend
2  Shelby RONDINO as a resident.

3      23.    At approximately 2:00 PM on December 11th, I observed ROSARIO exit the
4  apartment building and walk across the street to a black GMC Yukon SUV, bearing
5  Washington license plate BWZ2773, registered to RONDINO.  ROSARIO sat inside the
6  driver's seat of the vehicle for several minutes and then got out of the vehicle and walked
7  back into the apartment building.

8      24.    Approximately 10 minutes later, I observed another individual, first
9  identified by name and later identified as a confidential informant (CI-2) walk up and
10  stand next to the GMC Yukon.  Several minutes after that, another individual, later
11  identified as Jack Schira, drove up in beat-up red Toyota Celica with expired tags, parked,
12  and joined CI-2 waiting beside the GMC Yukon.

13      25.    At approximately 2:20 PM, ROSARIO walked out of the apartment building
14  and walked over to the GMC Yukon, where he joined Schira and CI-2 and opened up the
15  back gate/trunk area.  I observed the three at the back of the vehicle for several minutes
16  conducting what appeared to me, based on my training and experience, to be a narcotics
17  deal.  Afterward, Schira walked back to his vehicle with his hands buried in his pockets,
18  got into the vehicle and sat inside of it fidgeting in the driver's seat.  Both ROSARIO and
19  CI-2 then walked into the apartment building.  Approximately 10 minutes later, when I
20  had to terminate the surveillance, Schira still sat in the driver's seat of his vehicle.

21      26.    Later that same day, I reviewed surveillance camera footage of 3025 7th
22  Street, in Renton, the residence of David Rosario Sr., to whom ROSARIO was given
23  custody and where ROSARIO is supposed to be residing.  The footage from the camera
24  showed video footage starting December 1, 2020.  During this 11-day period, ROSARIO
25  visited the residence only one time, on December 2, 2020, when he can be seen pulling
26  into the driveway in the GMC Yukon.  ROSARIO could be seen smoking a cigarette in
27  the vehicle with another passenger in the driveway for several minutes.  ROSARIO then
28  entered the residence, while the passenger waited in the vehicle.  Several minutes later

AFFIDAVIT OF SA HUNT - 7
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  ROSARIO could be seen returning to the driver's seat of the GMC Yukon and driving

2  away.  ROSARIO was on the property for approximately nine minutes.

3  **Interviews of CI-2**

4      27.    On December 18, 2020, Det. Eshom and I made contact with CI-2, whom I

5  observed with ROSARIO on December 11th.  CI-2 agreed to cooperate with Det. Eshom

6  and I and provided information regarding ROSARIO.  I showed CI-2 surveillance

7  photographs of the meeting between ROSARIO, Shira, and CI-2 on December 11th, at the

8  GMC Yukon, parked outside ROSARIO's apartment building.  CI-2 confirmed that the

9  meeting was a drug deal for fentanyl pills.  CI-2 explained that he/she knew ROSARIO to

10  be a drug dealer and that he carried a .40 caliber pistol with him when he sold his drugs.

11  CI-2 stated that he/she knew this because ROSARIO sometimes asked him/her to hold his

12  pistol for him.  CI-2 explained that ROSARIO lived in an apartment in West Seattle

13  belonging to the parents of his girlfriend, Shelby RONDINO, at 6512 35th Ave, SW, Apt

14  208.

15      28.    CI-2 explained that he/she communicated with ROSARIO over Facebook

16  messenger, and showed me a text string from November 26, 2020, in which ROSARIO

17  spoke about selling drugs.  In that string, CI-2 asked ROSARIO, in sum, where he was.

18  ROSARIO then responded, "in White Center about to hot a joog than come there".  I

19  know from my experience that the term "joog" refers to selling narcotics.  CI-2 confirmed

20  that this is what ROSARIO meant.

21      29.    CI-2 told me about an incident in which several individuals set fire to a

22  vehicle belonging to CI-1.  CI-2 stated that two friends of ROSARIO had set fire to CI-1's

23  vehicle because CI-1 had cooperated with law enforcement and had worked a case against

24  ROSARIO.  CI-2 did not know if ROSARIO was involved in setting the fire, but stated

25  that ROSARIO had told CI-2 that he wanted CI-1 dead because CI-1 had set him up and

26  introduced an undercover agent to him who had bought guns and drugs from him.

27  According to CI-2, ROSARIO has repeatedly solicited the murder of CI-1.  CI-2

28  explained that ROSARIO has asked CI-2, on numerous occasions, to find someone to

AFFIDAVIT OF SA HUNT - 8
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  murder CI-1, stating that he would pay cash for someone to kill CI-1.  CI-2 has previously
2  warned CI-1 about ROSARIO's threats.

3      30.   In a later conversation with CI-2, CI-2 told me that, in our first meeting,
4  he/she was nervous about giving up information regarding ROSARIO because he/she was
5  a violent person and willing to retaliate against people for working with law enforcement.
6  CI-2 explained that he/she felt more comfortable as the meeting progressed but that he/she
7  had given me false statements regarding the arson that minimized ROSARIO's
8  involvement.  CI-2 explained that he/she was nervous about ROSARIO but, in reflection,
9  he/she was even more scared that somebody who didn't have anything to do with
10  ROSARIO or CI-1 would have been killed by the fire.  CI-2 then told me that he/she had
11  been present for and had overheard a phone call between ROSARIO and an another
12  individual he/she knew as Jordan SANCHEZ.  In that call, SANCHEZ described how he
13  had been driven to CI-1's apartment complex by another individual whom CI-2 knew to
14  be Joseph RODRIGUEZ, and, once there, ran up to CI-1's vehicle, cut the convertible top
15  open and poured a bottle of gasoline inside and then lit the fire.  From the phone call and
16  from speaking with ROSARIO, CI-2 knew that SANCHEZ set fire to the vehicle for 10
17  fentanyl pills, which ROSARIO paid him.

18      31.   CI-2 stated that ROSARIO displayed a photograph of the fire on his phone
19  while he was bragging about having paid SANCHEZ to set the fire.

20      32.   According to CI-2, ROSARIO is regularly distributing fentanyl pills,
21  methamphetamine, and heroin throughout King County, often in the Burien area.
22  ROSARIO delivers the controlled substances to customers using the GMC Yukon, which
23  is consistent with his conduct during the May-August 2020 undercover investigation and
24  my surveillance observations of him in December 2020.

25      33.   On December 24, 2020 CI-2 contacted me to tell me about a conversation
26  that CI 2 had witnessed between David ROSARIO and an individual whom CI-2 knew as
27  Ivan ISLAS.  CI-2 stated that he/she knows ISLAS to be a dealer of fentanyl and Xanax
28  pills.  CI-2 told me, in sum, that he/she was present for a conversation between ROSARIO

AFFIDAVIT OF SA HUNT - 9
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and ISLAS in which ROSARIO and ISLAS planned to kill CI-1. The two planned for

2  ISLAS to offer to sell CI-1 pills at a very good price to lure him/her into a drug deal,

3  however, instead of doing the drug deal ISLAS would kill CI-1 instead by shooting

4  him/her.

5       34.     Unbeknownst to me during the surveillance I conducted on December 11th,

6  CI-2 has worked for the King County Sheriff's Office as a confidential informant for

7  several months. CI-2 has provided the King County Sheriff's Office with accurate

8  information on multiple targets, which has led to the successful recovery of evidence for

9  narcotics crimes. CI-2 has been in and around the narcotics trade for several years and has

10  had problems, himself/herself, with substance abuse. CI-2 has multiple arrests for

11  domestic violence with which he/she was found with narcotics paraphernalia, and has one

12  conviction, a gross misdemeanor for violating a no-contact order. CI-2 works for the King

13  County Sheriff's Office for monetary consideration. CI-2 is now in the process of

14  becoming an active informant with the ATF, and ATF has provided monetary

15  compensation to CI-2 for the information he/she provided about ROSARIO.

16            **Controlled Purchase of Fentanyl from ROSARIO on January 5, 2021**

17       35.     On or about January 4, 2021, CI-2 told me that he/she had spent the night in

18  ROSARIO's apartment several days prior. During CI-2's stay at ROSARIO's apartment,

19  ROSARIO showed CI-2 a safe, inside of which ROSARIO displayed for CI-2 the contents

20  that included approximately 1,000 pills of fentanyl, commonly referred to as a "boat" in

21  drug parlance, along with approximately one pound of methamphetamine.

22       36.     On January 5, 2021, I set up a controlled buy to purchase 30 fentanyl pills

23  from ROSARIO through CI-2. CI-2 ordered the 30 pills from ROSARIO over calls and

24  text messages utilizing the Facebook Messenger Application.

25       37.     I equipped CI-2 with an audio transmitter that recorded, another audio

26  recording device and $300.00 to purchase 30 fentanyl pills at $10.00 per pill. Task Force

27  Officer Eshom searched CI-2 for drugs, cash, or other contraband, and none was found.

28  At approximately 8:20 PM, ATF Special Agent Prose dropped CI-2 off at the residence of

1  one of ROSARIO's associates at 6527 21st Ave. SW in West Seattle, where ROSARIO

2  had instructed CI-2 to go.

3      38.    Approximately 45 minutes later, agents observed ROSARIO arrive at the

4  West Seattle location, driving his GMC Yukon. Shortly after that I heard ROSARIO and

5  several others to include SANCHEZ, RONDINO and ISLAS enter the residence. I heard

6  ROSARIO accuse CI-2 of breaking into his car and I heard ROSARIO threaten to hurt CI-

7  2 by stepping on CI-2's injured foot, which causes him/her to walk with a cane. After the

8  deal, while debriefing CI-2, CI-2 explained to me ROSARIO had pulled his .40 caliber

9  pistol out while he accused CI-2 of breaking into his car and pointed the firearm at CI-2's

10  head.

11      39.    I heard CI-2 deny having broken into ROSARIO's vehicle. Then, CI-2 and

12  ROSARIO had a short argument over money, after which ROSARIO stopped talking and

13  RONDINO began to speak. RONDINO stated that three Somali males had tried to rob

14  them earlier that day in Tukwila near Foster High School when they agreed to meet

15  regarding the sale of an iPhone 12. The meeting was set up over Facebook Marketplace.

16  RONDINO explained that one of the individuals at the sale pulled a gun, but that they ran

17  when ROSARIO pulled his gun. RONDINO then stated that one of the males shot at and

18  hit ROSARIO's vehicle as they drove away.

19      40.    Shortly after RONDINO finished telling CI-2 about the shooting, ROSARIO

20  gave CI-2 a small plastic container holding 25 blue pills marked with an "M" in exchange

21  for $300.00. While debriefing CI-2 after the deal, CI-2 explained that ROSARIO had just

22  put the container of pills into CI-2's pocket and took the money. According to CI-2,

23  ROSARIO stated that the price had gone up to $12.00 per pill. C-2 then departed the

24  residence and was picked up by Special Agent Prose. I met with Special Agent Prose and

25  CI-2 a short distance away where I retrieved the transmitter and recording devices and the

26  fentanyl pills which ROSARIO had given to CI-2. Task Force Officer Eshom searched

27  CI-2 for drugs, cash, or other contraband, and none was found. Task Force Officer Eshom

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 || later had the pills tested at the King County Medical Examiner's Office. The pills tested
2 || presumptively positive for fentanyl.

3 ||      41.      On December 30, 2020, the Honorable Mary Alice Theiler, United States
4 || Magistrate Judge, authorized a Search Warrant and Pen Trap Order for ROSARIO's
5 || cellular phone, *see* MJ20-825, which I then executed on AT&T.[3] On December 31, 2020,
6 || I began receiving GPS location coordinates for the location of ROSARIO's cellular phone
7 || every 15 minutes. At 11:59 AM on January 5, 2021, I received a message from AT&T
8 || that ROSARIO's cell phone was located a block away from Foster High School with a
9 || certainty factor of 201 meters. At approximately 12:05 PM on January 5, 2020, Tukwila
10 || PD received a call for multiple shots fired near Foster High School. The witness to the
11 || incident reported two vehicles involved. The witness's description of one of the vehicles
12 || matches ROSARIO's black GMC Yukon. At 12:14 PM, I received another notification
13 || that ROSARIO's cell phone was located near Jordan SANCHEZ's residence with a
14 || certainty factor of 164 meters. Recall that CI-2 previously told me that SANCHEZ was
15 || the person whom ROSARIO had paid to set fire to CI-1's vehicle.

16 ||      42.      CI-2 later asked ROSARIO, via text message, who advertised the iPhone 12
17 || on Facebook Market Place. ROSARIO told him/her that the name on the advertisement
18 || was Edward Perez. On January 6, 2021, officers from the King County Sheriff's Office
19 || arrested three males of Somali descent, whom they had probable cause to believe were
20 || conducting robberies by advertising an iPhone 12 for sale on Facebook Marketplace,
21 || through an account listed to the name Edward Perez. Upon their arrest, King County
22 || Sheriff's deputies seized a vehicle that had a bullet hole in the windshield, with no
23 || apparent exit point. That vehicle has been preserved for a pending state search warrant.

24 ||      43.      On January 7, 2021, while conducting surveillance on ROSARIO, I observed
25 || ROSARIO, with SANCHEZ, drive from SANCHEZ's residence at 52nd Avenue and 52nd
26 || Place in Tukwila, to multiple locations. First, they drove to several spots in the Rainier
27 ||
28 || _____

[3] On December 30, 2020, Judge Theiler also authorized a tracking warrant for the GMC Yukon. *See* GJ20-802.

AFFIDAVIT OF SA HUNT - 12
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Beach neighborhood of Seattle, then to an exhaust shop in Auburn, then to Ikea in Renton
2   and then into the Renton Highlands neighborhood.  At these locations, ROSARIO or
3   SANCHEZ would meet up with other individuals for very short durations.  Based on my
4   training and experience, this behavior is  consistent with dealing narcotics, and it is the
5   same type of activity I observed from ROSARIO during the period of May – August 2020,
6   when I was purchasing firearms and narcotics from him in an undercover capacity.

7                        **Search of ROSARIO and RONDINO's Apartment**

8          44.    On January 11, 2021, the Honorable Michelle L. Peterson, United States
9   Magistrate Judge, issued a search warrant for ROSARIO's person, the GMC Yukon, and
10   the apartment unit he shared with RONDINO, located at 6512 35th Avenue Southwest,
11   Apartment 208, in West Seattle.  MJ21-011.

12          45.    At approximately 2:00 p.m. on January 11, 2021, agents located ROSARIO
13   and attempted to execute the search warrant.  ROSARIO was driving the GMC Yukon with
14   Shelby RONDINO and her sister Sierra Rondino in the vehicle.  They made a short stop at
15   the residence of James French at 6527 21st Avenue in Seattle then drove southbound
16   rounding a corner where the street turned into Myrtle Street. At that point, unmarked law
17   enforcement vehicles, both immediately in front and behind ROSARIO's vehicle, initiated
18   their emergency lights and sirens. ROSARIO then evaded both cars accelerating at a very
19   high rate of speed, going around the vehicles, and running over and through several
20   construction barricades. Two King County Sheriff's Office (KCSO) marked vehicles then
21   initiated their lights and sirens pulling behind ROSARIO but ROSARIO dodged and
22   weaved through vehicles. Since ROSARIO had by then reached a heavily populated area
23   with dense traffic, the law enforcement officers did not give chase.

24          46.    At approximately 2:30 p.m., agents located the GMC Yukon, which had been
25   abandoned at 35th Street and Othello.  Agents observed Shelby RONDINO and her sister
26   walking separately in the area of the vehicle. Agents then contacted the vehicle, breached
27   the rear driver's side window (every window in the vehicle had limousine tint including the
28   windshield) so they could see inside. The agents found the vehicle unoccupied.  KCSO

AFFIDAVIT OF SA HUNT - 13
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  marked units then secured the vehicle and had it towed to KCSO's 4th Precinct, where
2  agents later conducted a search of it pursuant to the federal warrant.

3      47.    Agents immediately proceeded to ROSARIO's apartment to execute the
4  search warrant.  ROSARIO and RONDINO were not present at the apartment, but
5  RONDINO's sister was there.  RONDINO's sister told agents that she had received a call
6  from Shelby RONDINO, asking her to access ROSARIO's safe in their bedroom, remove
7  the drugs and the gun and take it to James French's house.  Shelby RONDINO then texted
8  her sister the code for the safe.  Agents used the code to open the safe, which contained a
9  .40 caliber pistol, suspected methamphetamine and approximately $9,000.00 cash.  The
10 suspected methamphetamine was field-tested with positive results for methamphetamine.

11     48.    At approximately 5:10 p.m., agents received information that ROSARIO had
12 returned to his father's residence in Renton.  Agents arrested ROSARIO at that location at
13 approximately 5:40 p.m.

14     49.    ROSARIO was transported to KCSO's 4th Precinct where agents advised him
15 of his constitutional rights.  ROSARIO agreed to waive those rights and speak to agents.
16 During a video- and audio-recorded interview, ROSARIO denied involvement in the arson
17 of CI-1's car but admitted that his cellphone may contain a photograph of the burned car.
18 He said that the photograph was on his girlfriend's sister's (Sierra Rondino's) phone, and
19 he took a photograph of that photograph.

20     50.    ROSARIO stated that he knew who set the fire and told the agents, in sum,
21 that it was a friend of his named "Jordan".  Referring to CI-1, ROSARIO stated, "I think he
22 [Jordan] just doesn't like [CI-1] because [CI-1] told on me."  ROSARIO also admitted that
23 he had an Apple iCloud account that was active, and which he used to save and store the
24 photographs that he took and received on his phone, an Apple iPhone XS.

25     51.    ROSARIO admitted that the .40 caliber pistol in the safe was his, that he
26 received the pistol while he was on pretrial release in CR20-133 RAJ, and that he had been
27 distributing controlled substances while on pretrial release.  ROSARIO said that $9,000.00

28

AFFIDAVIT OF SA HUNT - 14
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  cash belonged to an associate who supplied him (ROSARIO) with fentanyl pills for
2  distribution.

3      52.    During the interview, ROSARIO also admitted that he fired multiple shots
4  from the .40 caliber pistol during an altercation with other individuals in Tukwila on
5  January 5, 2021.

6      53.    Agents returned to the GMC Yukon to execute the search warrant on that
7  vehicle.  Inside, they located ROSARIO's cellular phone which was laying on the
8  floorboard of the driver's side compartment and some narcotics paraphernalia.  Although
9  the results of a full forensic examination of the phone are pending, a cursory review of the
10  phone showed numerous messages arranging the sale of controlled substances.  During his
11  forensic examination of ROSARIO's cellular phone, authorized by the warrant issued
12  under MJ21-011, Detective Myers of the King County Sheriff's Office Digital Forensics
13  Unit was able to identify ROSARIO's Apple ID as: **thejunebug206@icloud.com.**

14      54.    On January 15, 2021, during Detective Myers' forensic examination of the
15  ROSARIO's cell phone for photographs of drugs and firearms, as authorized by the
16  warrant issued under MJ21-011, Detective Myers located a photograph of a burned car.

17      55.    ATF Special Agent Brian Arnold reviewed photographs and markings of the
18  .40 caliber pistol recovered from ROSARIO's safe.  SA Arnold has additional training and
19  is considered an expert in determining the location of a firearm's manufacture.  SA Arnold
20  opined that the pistol was not manufactured in the State of Washington and therefore must
21  have traveled in interstate commerce in order to arrive in the State of Washington.

22        **V.    COMMON CHARACTERISTICS OF DRUG TRAFFICKING**

23      56.    As a result of my training and experience, and based on my consultation with
24  other agents and law enforcement officers, I have an understanding of the manner in which
25  narcotics are distributed and the various roles played by individuals and groups in their
26  distribution. I have encountered and have become familiar with various tools, methods,
27  trends, paraphernalia, and related articles utilized by various traffickers in their efforts to
28  import, conceal, and distribute controlled substances. I am also familiar with the manner in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | which drug traffickers use telephones, often cellular telephones, to conduct their unlawful
2 | operations. I am also familiar with the manner in which drug traffickers will use weapons to
3 | protect their drug activities and further its goals.

4 | 57.   Based upon my training, experience, and conversations with other experienced
5 | officers and agents, I know that:

6 | a.   Drug trafficking conspiracies usually take place over several months or
7 | years, and continue to operate even when enforcement activity results in arrests and/or
8 | seizures of drugs and/or money.

9 | b.   Persons involved in the distribution of controlled substances typically
10 | will obtain and distribute drugs on a regular basis, much as a distributor of a legal
11 | commodity would purchase stock for sale.  This especially true for dealers of heroin
12 | and fentanyl, as their customers will find another source to prevent themselves from
13 | getting sick if they cannot get narcotics from their primary dealer. Similarly, such
14 | drug dealers will maintain an "inventory," which will fluctuate in size depending upon
15 | the demand for and the available supply of the product.

16 | c.   It is common for drug dealers to possess narcotics, drug paraphernalia,
17 | and other items which are associated with the sale and use of controlled substances
18 | such as scales, containers, cutting agents/substances, and packaging materials in their
19 | residences, stash houses, storage units, garages, outbuildings and/or vehicles on their
20 | property.

21 | d.   Drug traffickers often document aspects of their criminal conduct
22 | through photographs or videos of themselves, their associates, their property, and their
23 | product. Drug traffickers usually maintain these photographs or videos in their
24 | possession.

25 | e.   Drug traffickers use mobile electronic devices including cellular
26 | telephones and other wireless communication devices in connection with their illegal
27 | activities in order to set up meetings with coconspirators, conduct drug and firearm
28 | transactions, or to arrange for the transportation of drugs, firearms, or drug/firearm

AFFIDAVIT OF SA HUNT - 16
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

proceeds. As described below, such equipment often contains evidence of these illegal activities.

f.      The ubiquity of smart phones has also increased the use of social media as an instrumentality of drug trafficking.  Drug traffickers often use instant messaging and chat applications, such as Facebook Messenger, Instagram, Snapchat, WhatsApp, Telegram, and Signal, to set up meetings with coconspirators, conduct drug and firearm transactions, arrange for the transportation of drugs, firearms, or drug/firearm proceeds, exchange photographs and videos of drugs and firearms, and brandish firearms for intimidation and security.  In my experience, drug traffickers often prefer these instant messaging and chat applications that incorporate audio and video call functionality to more traditional phone calls and text messages. There are several reasons for this.  Primarily, drug dealers prefer these applications because these communications often times cannot be recorded by third parties, some applications have settings that automatically delete communications after a set period of time, and some applications do not keep any records.  Further, one does not need a cellular plan to make these communications but can simply do so utilizing a public or private WiFi network.

g.      Photographs and videos in a social media account are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Pictures also identify associates likely to be members of the drug trafficking organization. Some drug dealers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs. Also, digital photos and videos often have embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo or video was taken. Showing where the photo or video was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          h.      Based on my training and experience in investigating numerous

2   firearms possession and trafficking offenses, I am aware that when individuals who

3   are prohibited from legally possessing firearms seek to acquire firearms, they

4   typically seek to obtain the firearms from private sellers. A common way in which

5   these types of private firearm sales, also referred to as "street sales," are transacted is

6   via electronic communications such as text message, email, and/or chat applications.

7   I know that cell phones are frequently used to arrange such transactions because of

8   the flexibility and mobility they offer. I am further aware that when individuals are

9   offering items of value for sale, such as firearms, it is common for them to take a

10  photograph of the item and send it via text message or chat application to an interested

11  party for their review, or to take a photograph of it to post/advertise it via social media

12  or the internet. During numerous investigations of firearms sales, I have found it to

13  be common for buyer's or seller's cell phones to contain photographs of the firearms

14  that were bought or sold.

15          **VI.  INFORMATION REGARDING APPLE ID AND iCLOUD[4]**

16          58.     Apple is a United States company that produces the mobile devices iPhone,

17  iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop

18  computers based on the Mac OS operating system.

19          59.     Apple provides a variety of services that can be accessed from Apple devices

20  or, in some cases, other devices via web browsers or mobile and desktop applications

21  ("apps"). As described in further detail below, the services include email, instant

22  messaging, and file storage:

23

24

25

26  [4]    The information in this section is based on information published by Apple on its website, including, but not
    limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at
27  http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available
    at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does
28  iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at
    https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at
    https://support.apple.com/kb/PH26502.

AFFIDAVIT OF SA HUNT - 18
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.  iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

AFFIDAVIT OF SA HUNT - 19
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.    Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.    Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.    App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

60.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

61.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

1   62.   Apple captures information associated with the creation and use of an Apple
2   ID. During the creation of an Apple ID, the user must provide basic personal information
3   including the user's full name, physical address, and telephone numbers. The user may
4   also provide means of payment for products offered by Apple. The subscriber information
5   and password associated with an Apple ID can be changed by the user through the "My
6   Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date
7   on which the account was created, the length of service, records of log-in times and
8   durations, the types of service utilized, the status of the account (including whether the
9   account is inactive or closed), the methods used to connect to and utilize the account, the
10   Internet Protocol address ("IP address") used to register and access the account, and other
11   log files that reflect usage of the account.

12   63.   Additional information is captured by Apple in connection with the use of an
13   Apple ID to access certain services. For example, Apple maintains connection logs with IP
14   addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and
15   App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's
16   website. Apple also maintains records reflecting a user's app purchases from App Store
17   and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and
18   "mail logs" for activity over an Apple-provided email account. Records relating to the use
19   of the Find My iPhone service, including connection logs and requests to remotely lock or
20   erase a device, are also maintained by Apple.

21   64.   Apple also maintains information about the devices associated with an Apple
22   ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's
23   IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which
24   is the serial number of the device's SIM card. Similarly, the telephone number of a user's
25   iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple
26   also may maintain records of other device identifiers, including the Media Access Control
27   address ("MAC address"), the unique device identifier ("UDID"), and the serial number.
28   In addition, information about a user's computer is captured when iTunes is used on that

AFFIDAVIT OF SA HUNT - 21
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  computer to play content associated with an Apple ID, and information about a user's web
2  browser may be captured when used to access services through icloud.com and apple.com.
3  Apple also retains records related to communications between users and Apple customer
4  service, including communications regarding a particular Apple device or service, and the
5  repair history for a device.

6       65.    Apple provides users with five gigabytes of free electronic space on iCloud,
7  and users can purchase additional storage space.  That storage space, located on servers
8  controlled by Apple, may contain data associated with the use of iCloud-connected
9  services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My
10  Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and
11  other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network
12  information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS
13  device backups, which can contain a user's photos and videos, iMessages, Short Message
14  Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail
15  messages, call history, contacts, calendar events, reminders, notes, app data and settings,
16  Apple Watch backups, and other data.  Records and data associated with third-party apps
17  may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant
18  messaging service, can be configured to regularly back up a user's instant messages on
19  iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can
20  nonetheless be decrypted by Apple.

21       66.    In my training and experience, including conversations with other
22  investigators, I am aware that evidence of who was using an Apple ID and from where, and
23  evidence related to criminal activity of the kind described above, may be found in the files
24  and records described above.  This evidence may establish the "who, what, why, when,
25  where, and how" of the criminal conduct under investigation, thus enabling the United
26  States to establish and prove each element or, alternatively, to exclude the innocent from
27  further suspicion.

28

AFFIDAVIT OF SA HUNT - 22
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

67.     For example, the stored communications and files connected to an Apple ID
may provide direct evidence of the offenses under investigation.  Based on my training and
experience, instant messages, emails, voicemails, photos, videos, and documents are often
created and used in furtherance of criminal activity, including to communicate and
facilitate the offenses under investigation.

68.     Account activity may also provide relevant insight into the account owner's
state of mind as it relates to the offenses under investigation.  For example, information on
the account may indicate the owner's motive and intent to commit a crime (e.g.,
information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting
account information in an effort to conceal evidence from law enforcement).

69.     Therefore, Apple's servers are likely to contain stored electronic
communications and information concerning subscribers and their use of Apple's services.
In my training and experience, such information may constitute evidence of the crimes
under investigation including information that can be used to identify the account's user or
users.  For example, Apple's servers are likely to contain photographs of firearms that
Rosario took on his phone and backed up through his iCloud account, as well as a
photograph of the arson of CI-1's vehicle.

### VII. INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

70.     I anticipate executing this warrant under the Electronic Communications
Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using
the warrant to require Apple to disclose to the government copies of the records and other
information (including the content of communications) particularly described in Section I
of Attachment B.  Upon receipt of the information described in Section I of Attachment B,
government-authorized persons will review that information to locate the items described
in Section II of Attachment B.

### VIII. REQUEST FOR SEALING

71.     I further request that the Court order that all papers in support of this
application, including the affidavit and search warrant, be sealed until further order of the

AFFIDAVIT OF SA HUNT - 23
USAO #2020R00604

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Court.  These documents discuss an ongoing criminal investigation that is not public or

2  known to all the targets of the investigation, and which relies on information provided by a

3  confidential source whose cooperation and identity are not known to the targets of the

4  investigation.  Accordingly, there is good cause to seal these documents because their

5  premature disclosure may seriously jeopardize that investigation, including endangering

6  the safety of confidential sources.

7  **IX. CONCLUSION**

8      72.     Based on the foregoing, I request that the Court issue the proposed search

9  warrant.

10     73.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is

11  not required for the service or execution of this warrant.

12     74.     The government will execute this warrant by serving it on Apple.  Because

13  the warrant will be served on Apple, who will then compile the requested records at a time

14  convenient to it, reasonable cause exists to permit the execution of the requested warrant at

15  any time in the day or night.

16

17

18

19                                              J. BENJAMIN HUNT

                                                Special Agent, ATF

20

21     The above-named agent provided a sworn statement attesting to the truth of the

22  contents of the foregoing affidavit on the 26th day of January, 2021.

23

24

25                                              PAULA L. MCCANDLIS

                                                United States Magistrate Judge

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Apple ID:

**thejunebug206@icloud.com** (the "account") that is stored at premises owned, maintained,

controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park

Way, Cupertino, California, 95014.

**ATTACHMENT B**

**Particular Things to be Seized**

I.    **Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.    All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic

Attachment A & B
USAO #2020R00604

Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile

Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"),

Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services

Digital Network Numbers ("MSISDN"), International Mobile Subscriber

Identities ("IMSI"), and International Mobile Station Equipment Identities

("IMEI");

c.      The contents of all instant messages associated with the account **from May 28,**
**2020 to January 12, 2021,** including stored or preserved copies of instant

messages (including iMessages, SMS messages, and MMS messages) sent to and

from the account (including all draft and deleted messages), the source and

destination account or phone number associated with each instant message, the

date and time at which each instant message was sent, the size and length of each

instant message, the actual IP addresses of the sender and the recipient of each

instant message, and the media, if any, attached to each instant message;

d.      The contents of all files and other records stored on iCloud, including all iOS

device backups, all Apple and third-party app data, all files and other records

related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo

Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes),

iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact

and buddy lists, notes, reminders, calendar entries, images, videos, voicemails,

device settings, and bookmarks;

e.  All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

f.  All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

g.  All records pertaining to the types of service used;

h.  All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

i.  All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and
instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846 (distribution/possession with intent
to distribute controlled substances and conspiracy to commit the same), 18 U.S.C. § 922(n)
(unlawful possession of a firearm), 18 U.S.C. § 924(c) (carrying a firearm during and in relation
to a drug trafficking crime), 18 U.S.C. § 1512 (witness intimidation), 18 U.S.C. § 1513 (witness
retaliation), and 18 U.S.C. §§ 844(h)(1) and (m) (arson and conspiracy to commit the same),
involving David Rosario since **May 28, 2020**, including, for the Apple ID identified on
Attachment A, content pertaining to the following matters:

(a) Sale of controlled substances, such as fentanyl, heroin, or methamphetamine;

(b) Firearms or firearm-related items, such as magazines or ammunition;

(c) The November 20, 2020 arson, including, but not limited to, communications,
photographs, and videos pertaining to CI-1's vehicle, fire, matches, lighters,
incendiary devices, or flammable materials, such as gasoline;

(d) Content tending to show the state of mind of Rosario and his associates regarding
CI-1, including, but not limited to, communications, photographs, and videos
pertaining to CI-1's physical attributes, cooperation with law enforcement,
conduct, location, addresses, family, associates, or vehicles, and actions to be
taken against CI-1;

(e) All communications, including photographs and videos, exchanged between
David Rosario and Jordan Sanchez, Joseph Rodriguez, or Ivan Islas;

(f) The identity of the person(s) who created or used the Apple ID, including records
that help reveal the whereabouts of such person(s);

(g) Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

(h) Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

(i) Evidence indicating the account holder's state of mind as it relates to the crimes under investigation; and

(j) Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.